IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**TIMOTHY FELDMAN,**<br><br>Defendant | Case No. 1:25-mj-1944-CDA<br>**UNDER SEAL**<br><br>✓ FILED   ___ ENTERED<br>___ LOGGED   ___ RECEIVED<br><br>4:02 pm, Aug 01 2025<br>AT BALTIMORE<br>CLERK, U.S. DISTRICT COURT<br>DISTRICT OF MARYLAND<br>BY ____R.C.____ Deputy |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

Your affiant, Olivia Saggio, a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, hereby depose and state as follows:

**Introduction and Background**

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Special Agent with the ATF since January 16, 2024. I am currently assigned to the ATF Baltimore Field Division, Group VI, which investigates violations of federal firearms laws, violent crimes, and narcotics trafficking. I attended the Department of Homeland Security's Criminal Investigator Training Program ("CITP") and ATF's Special Agent Basic Training ("SABT") at the Federal Law Enforcement Training Center ("FLETC"), both located in Glynco, Georgia for a combined period of twenty-six weeks. I have received extensive training, both formal and on-the-job, in the provisions of the Federal Firearms Laws and Federal Narcotics Laws administered under Title 18, Title 21 and Title 26 of the United States Code. As an ATF agent, I have conducted and

participated in numerous investigations concerning violations of federal firearm laws, violations of federal controlled substance laws, and the commission of violent crimes. I have received specialized training regarding, and have personally participated in, various types of investigative activities, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of witnesses, informants, and other individuals who have knowledge concerning violations of federal firearms and controlled substance laws; (c) undercover operations; (d) the execution of search warrants; (e) the consensual monitoring and recording of conversations; (f) electronic surveillance through the use of pen registers and trap and trace device; (h) the handling, maintenance, and examination of evidence to include electronic devices. Prior to joining the ATF, I was an undergraduate student at the University of Minnesota-Twin Cities, where I received a bachelor's degree in psychology and a bachelor's degree in Sociology of Law, Criminology, and Justice.

2. I submit this affidavit in support of a criminal complaint and the issuance of an arrest warrant for Timothy Antonio **FELDMAN** (year of birth 1990). Based on the facts within this Affidavit, I respectfully submit that there is probable cause to believe that **FELDMAN** violated the following offenses: 21 U.S.C. § 841(a) (manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, controlled substances) and 21 U.S.C § 846 (conspiracy to distribute and possess with intent to distribute controlled dangerous substances) (collectively the "**SUBJECT OFFENSES**").

3. This Affidavit is based upon my participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of obtaining a criminal complaint and arrest warrant, it does not include all the facts that I have learned during

this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. In making this Affidavit, I am relying only on the facts stated herein.

4. Information in this Affidavit does not always set forth my personal observations, but rather at times reflects information from reports, as well as information provided to me by other law enforcement agents who observed the events described and to whom I have spoken or whose reports I have read.

## Summary of Probable Cause

5. In January 2025, the ATF initiated an investigation into Timothy Antonio **FELDMAN**, a suspected narcotics trafficker in and around the Baltimore area of Maryland. The investigation was the result of Maryland State Police ("MSP") receiving information that a man known as Timothy **FELDMAN** was distributing narcotics in the Baltimore area. During the investigation, an ATF Special Agent operated in an undercover capacity ("UC"), which led to multiple controlled purchases of narcotics. Those purchases are detailed below:

### January 29, 2025 Controlled Operation

6. On or about January 27, 2025, the UC called **FELDMAN** and arranged for the purchase of cocaine. **FELDMAN** advised he would send "his brother" to deliver the agreed upon narcotics to the UC. However, **FELDMAN** stated he would stay on the phone during the transaction. On January 29, 2025, **FELDMAN** advised that his brother would be driving a BMW and would meet with the UC at a predetermined location in Baltimore County, Maryland. The UC traveled to this location in the UC[1] vehicle. Shortly thereafter, a blue BMW with a Maryland

---

[1] During a controlled purchase, the UC, as well as the UC vehicle, is equipped with a device that is capable of capturing audio and video. Investigators can also listen to the controlled purchase in real time to ensure the safety of the UC and the integrity of the evidence being sought.

temporary tag of T2141904 was observed. An unidentified black male exited the driver's seat of the BMW and entered the front seat of the UC vehicle. At this time, the unidentified individual provided the UC with four knotted clear plastic baggies containing a white powdery substance of suspected cocaine in exchange for $3,200. The CDS was recovered by law enforcement and field tested utilizing a NIK Field Test Kit and it displayed a positive reaction for the presence of cocaine. Final lab results confirmed the powder to be approximately 120.13 grams of cocaine, a Schedule II drug.

### February 12, 2025 Controlled Operation

7. On or about February 7, 2025, the UC contacted **FELDMAN**, to arrange for the purchase of narcotics. During this phone call, **FELDMAN** informed the UC that he was out of town and would send his brother to conduct the transaction. On February 12, 2025, the UC travelled in the UC vehicle to a predetermined location in Baltimore County. Shortly after arriving at this location, **FELDMAN** called the UC. **FELDMAN** indicated his brother did not want to do the transaction in that location and told the UC to follow the BMW. At this time, investigators observed a blue BMW, matching the vehicle used during the January 29, 2025 purchase, drive through the parking lot and past the UC vehicle. The UC followed the BMW from the predetermined location to a gas station a short distance away and the individual provided the UC with four knotted clear plastic baggies similar in appearance to the narcotics purchased previously and containing a white powdery substance of suspected cocaine in exchange for $3,200. **FELDMAN** stayed on the phone with the UC for the entire duration of the transaction. The suspected cocaine was field tested utilizing a NIK Field Test Kit and it displayed a positive reaction for the presence of cocaine. Final lab results confirmed the powder to be approximately 114.55 grams of cocaine, a Schedule II drug.

**March 5, 2025, Controlled Operation**

8.     On or about March 1, 2025, the UC contacted **FELDMAN**. The UC inquired if **FELDMAN** was back in town, as **FELDMAN** stated previously he travels consistently, and if he was available to set up a purchase of narcotics. **FELDMAN** stated that he was available to meet with the UC on March 5, 2025. On March 5, 2025, the UC travelled in the UC vehicle to a predetermined business establishment in Baltimore County, MD. **FELDMAN** arrived alone and entered the rear of the establishment and greeted the UC, as well as an additional ATF Task Force Officer ("TFO") also operating in an undercover capacity. Inside the establishment, **FELDMAN** provided the UC with six knotted clear plastic baggies similar in appearance to the narcotics purchased previously and containing a white powdery substance of suspected cocaine in exchange for $4,800. Following the transaction, the UC and the TFO UC discussed future narcotics purchases with **FELDMAN**. **FELDMAN** stated that he could acquire "blues"[2]. **FELDMAN** also stated he could acquire firearms and currently had two firearms that he could sell to the UC later that day[3]. After his departure, **FELDMAN** later called the UC and stated he was unable to meet later for a transaction of the firearms. The recovered CDS was relinquished to law enforcement and field tested utilizing a NIK Field Test Kit. Preliminary results showed a positive reaction to the presence of cocaine and further results are pending.

**April 3, 2025 Controlled Operation**

9.     On or about March 28, 2025, **FELDMAN** contacted the UC about another purchase. On April 3, 2025, the UC travelled in the UC vehicle to a predetermined business establishment in

---

2 Investigators know "blues" to mean through their training and experience to be slang/code word for fentanyl pills.
3 FELDMAN stated he was in possession of a "ghost", a firearm that is does not have a serial number and is therefore untraceable, and one that looked like a Colt, an American firearms manufacturer, nine millimeter. He also stated he could get "Glocks", a popular firearm manufacturer, since he had been selling them previously and that he would be reasonable about the price, not going higher than $500.00-$550.00.

5

Baltimore County, MD. Upon arrival, **FELDMAN** was observed sitting alone in the driver's seat of a gold Lexus SUV parked in the parking lot. The UC entered the Lexus, and **FELDMAN** provided the UC with four knotted clear plastic baggies similar in appearance to the narcotics purchased previously and containing a white powdery substance of suspected cocaine in exchange for $3,400.00, as well as a clear baggie containing approximately one hundred blue pills believed to be suspected fentanyl pills for $500.00. The recovered CDS was relinquished to law enforcement. The suspected cocaine was field tested utilizing a NIK Field Test Kit and it did not show a positive reaction. The suspected fentanyl was not field tested due to the possibility of the product becoming airborne in the process, leading to harmful exposure. Further testing confirmed that the powdery substance did not contain any CDS. The blue pills were also tested and came back positive for a mixture of methamphetamine, a Schedule II CDS, ketamine, a Schedule III CDS, and xylazine[4].

### April 8, 2025 Controlled Operation

10.     On or about April 5, 2025, the UC contacted **FELDMAN**. The UC and **FELDMAN** discussed the cocaine received at the purchase that took place on April 3, 2025. **FELDMAN** stated his "brother" gave him the fake cocaine and **FELDMAN** further agreed to travel to Maryland for another transaction to make up for the fake cocaine. On April 8, 2025, the UC travelled in the UC vehicle to a predetermined business establishment in Baltimore County, MD. **FELDMAN** arrived alone in a gold Lexus SUV matching the vehicle he drove to the April 3, 2025 controlled purchase. **FELDMAN** exited the Lexus and entered the business establishment to meet with the UC. Once inside, **FELDMAN** provided the UC with one large and two small knotted clear plastic baggies similar in appearance to the narcotics purchased previously and

---

4 Xylazine is a sedative and muscle relaxant frequently used in veterinary medicine. Investigators are aware that this substance has been recently found mixed in with scheduled narcotics. It is not approved for human use and is not scheduled at this time.

containing a white powdery substance of suspected cocaine in exchange for $3,200.00. He also provided a clear baggie containing five individually packaged bags filled with blue pills, believed to be in total approximately five hundred suspected fentanyl pills, in exchange for $2,000.00. **FELDMAN** stated his "brother" had switched out the cocaine from the April 3, 2025, sale with fake product and that he is now dealing directly with his "uncle" instead. **FELDMAN** additionally stated that he has a firearms supplier he can acquire firearms from but that he is out of town and that he wouldn't be able to get them until his supplier returned. **FELDMAN** stated that he only gets "compacts[5]", as he does not like to deal with larger firearms. He specified that he could get "mini dracs[6]". The recovered CDS was relinquished to law enforcement and field tested utilizing a NIK Field Test Kit. Preliminary results showed a positive reaction to the presence of cocaine. The suspected fentanyl was not field tested due to exposure concerns. Further lab testing confirmed that the white powdery substance was approximately 166.957 grams of cocaine, a schedule II drug. The pills were also sent to the lab for testing and tested positive for a mixture of methamphetamine, (Schedule II) ketamine (Schedule III), and xylazine.

### May 7, 2025 Controlled Operation

11.   On or about May 2, 2025, **FELDMAN** contacted the UC. **FELDMAN** stated he was available to meet again on May 7, 2025 to conduct the narcotics transaction. On May 7, 2025, **FELDMAN** traveled to the pre-determined business establishment in Baltimore County to conduct the transaction. **FELDMAN** parked and entered the establishment to meet with the UC. Once inside the establishment, **FELDMAN** provided the UC with seven baggies weighing

---

5 Investigators believe "compacts" to mean "compact handguns" which are smaller than the standard handgun size, with a shorter barrel length than the standard sized pistol. They are more concealable due to their smaller size.
6 Mini dracs are assumed to be a miniatured AK style pistol that uses 7.62x 39mm ammunition.

7

approximately 243.5 grams in total: six were filled with a white powdery substance of suspected cocaine in exchange for $4,800, and one containing approximately 500 suspected blue fentanyl pills for $2,000.00. **FELDMAN** and the UC discussed future purchases. **FELDMAN** stated he would be "away" in the upcoming weeks working but could still meet. The recovered CDS was relinquished to law enforcement and field tested utilizing a NIK Field Test Kit. Preliminary results showed a positive reaction to the presence of cocaine. The suspected fentanyl was not field tested due to exposure concerns. Both substances were submitted to the lab for further confirmatory testing. Final results are not available at this time but are anticipated in the coming weeks.

### May 22, 2025 Controlled Operation

12. On or about May 16, 2025, **FELDMAN** contacted the UC to set up a narcotics transaction. On May 22, 2025, **FELDMAN** traveled to the pre-determined business establishment in Baltimore County to meet with the UC. Upon arrival, **FELDMAN** parked, entered the establishment and met with the UC. **FELDMAN** provided a total of four clear plastic baggies to the UC. Two of the plastic baggies contained smaller individually wrapped baggies of a white powdery substance of suspected cocaine. The two other baggies contained suspected fentanyl pills. One of the baggies contained approximately 1,000 blue pills of suspected fentanyl matching the same appearance as blue pills recovered at prior purchases in the months of April and May with **FELDMAN**. The other baggie contained approximately 77 white pills of suspected fentanyl. **FELDMAN** explained that the white pills were "new pills he wanted the UC to try." The UC exchanged $4,800.00 for the suspected cocaine and $4,000.00 for the suspected fentanyl pills. All items were recovered by law enforcement. The suspected cocaine was field tested utilizing a NIK Field Test Kit. Preliminary results showed a positive reaction to the presence of cocaine. The suspected fentanyl was not field tested due to exposure concerns. All substances were submitted

to a laboratory and await further testing.

### June 30, 2025 Controlled Operation

13. On or about June 9, 2025, **FELDMAN** contacted the UC to discuss meeting for a narcotics transaction on June 30, 2025. On June 30, 2025, **FELDMAN** was observed arriving in a grey Infiniti to the pre-determined business location in Baltimore County. **FELDMAN** parked, entered the establishment, and met with the UC. At that time, **FELDMAN** removed two clear bags from his front right shorts pocket. The first bag contained a white powdery substance believed to be suspected cocaine. The second bag was vacuum sealed and appeared to contain approximately 2,000 blue suspected fentanyl pills and approximately 500 white suspected fentanyl pills. The UC exchanged $4,000.00 for the suspected cocaine and $10,000.00 for the suspected fentanyl pills. After the exchange, the UCs and **FELDMAN** discussed future narcotics purchases. During this discussion, **FELDMAN** indicated he was the supplier for the pills. He further stated that he packaged up the cocaine the night before and was also the one who "pressed the pills[7]" the same night. **FELDMAN** stated he could provide any amount of cocaine the UC wanted and that he could facilitate an order of 2,000 fentanyl pills a week for $3.50 per pill. The UC and **FELDMAN** went on to discuss when the next transaction would take place and agreed to meet on July 30, 2025. The suspected CDS was recovered by law enforcement. The suspected cocaine was field tested utilizing a NIK Field Test Kit and it displayed a positive reaction for the presence of cocaine. The suspected fentanyl was not field tested due to exposure concerns. All substances were submitted to a certified lab for confirmatory testing. The results of these tests are not available at this time but are expected in the coming weeks.

---

7 Drug dealers utilize pill press machines to compress powdered CDS into solid, uniform pills and to imprint markings on them to look like legitimate prescription medication. The pills received from FELDMAN have contained consistent markings on them.

9

14. At present, a certified laboratory has tested some of the narcotics purchased from **FELDMAN** and have concluded the following results: approximately 401.637 grams of cocaine; and approximately 70.704 grams of a methamphetamine, ketamine, and xylazine mixture[8].

## Conclusion

15. Based on the foregoing, I respectfully submit that there is probable cause to issue the requested criminal complaint and arrest warrant for Timothy Antonio **FELDMAN** for the **SUBJECT OFFENSES**.

OLIVIA SAGGIO
Digitally signed by OLIVIA SAGGIO
Date: 2025.07.31 21:18:07 -04'00'

Olivia Saggio, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this __1st day__ of __August__, 2025.

_____
Honorable Charles D. Austin
United States Magistrate Judge
District of Maryland

---

[8] The narcotics tested were obtained during the undercover purchases conducted on the following dates: January 29, 2025 (120.13 grams of cocaine), February 12, 2025 (114.55 grams of cocaine), April 3, 2025 (11.685 grams of pressed pills with a mixture of methamphetamine, ketamine, and xylazine), and April 8, 2025 (166.957 grams of cocaine and approximately 59.019 grams of pressed pills with a mixture of methamphetamine, ketamine, and xylazine).

10